1  Terry W. Bird - State Bar No. 49038
       twb@birdmarella.com
2  Mitchell A. Kamin - State Bar No. 202788
       mak@birdmarella.com
3  Ariel A. Neuman - State Bar No. 241594
       aan@birdmarella.com
4  BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
   DROOKS, LINCENBERG & RHOW, P.C.
5  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
6  Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
7
   Attorneys for Defendants Pacific Eurotex
8  Corp. and Morad Neman

9

10                    **UNITED STATES DISTRICT COURT**

11        **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

12

13  THE UNITED STATES OF          CASE NO. 14-CR-00521-JAK
    AMERICA,
14                                **NOTICE OF MOTION; MOTION**
               Plaintiff,         **TO SUPPRESS SEARCH**
15                                **WARRANT EVIDENCE DUE TO**
         vs.                      **LACK OF PROBABLE CAUSE**
16                                **AND OVERBREADTH**
    PACIFIC EUROTEX CORP.,
17  et al.                        Hearing Date: January 8, 2015
               Defendants.        Time:         8:30 a.m.
18                                Location:     Courtroom of the Hon.
                                                John A. Kronstadt,
19                                              Roybal Federal Building
                                                Crtrm 750
20

21

22

23

24

25

26

27

28

3129855.4

**TO THE COURT AND ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT, on January 8, 2015 at 8:30 a.m., or as soon thereafter as this matter may be heard, in the courtroom of the Honorable John A. Kronstadt, 255 E. Temple St., Courtroom 750, Los Angeles, California 90012, Defendants Pacific Eurotex Corp. ("PEC") and Morad Neman will and hereby do move the Court to suppress all items seized from the offices of PEC and Neman Real Estate Investments, LLC ("NRE") located at 1433 Griffith Avenue ("1433 Griffith"). The search and seizure of these items violated the moving defendants' rights under the Fourth Amendment of the United States Constitution.

This Motion is based on this Notice of Motion, the attached Memorandum of Points and Authorities, the concurrently filed exhibits, the separately lodged search warrants and supporting affidavits, the entire court file in this matter, the arguments of counsel, evidence at any hearing, and any other matter of which the Court may take notice.

DATED:  December 4, 2014

Terry W. Bird
Mitchell A. Kamin
Ariel A. Neuman
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.


By: _____/s/_____
Terry W. Bird
Mitchell A. Kamin
Ariel A. Neuman
**Attorneys for Defendants Pacific Eurotex
Corp. and Morad Neman**

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................... 1

III.   ARGUMENT ...................................................................................... 3

    A.   The Search Warrant Affidavit Did Not Present Sufficient
         Evidence To Support a Finding of Probable Cause ................................ 3

         1.   The Affidavit Does Not Provide Evidence That PEC
              Engaged in Money Laundering ...................................................... 3

              a.    Elements of Money Laundering Conspiracy ...................... 3

                    (i)    Element 1: PEC Engaged in Four Financial
                          Transactions ....................................................... 4

                    (ii)   Element 2: The Money Involved in the
                          Transactions *Did Not* Represent Proceeds of
                          Specified Unlawful Activity ............................... 5

                    (iii)  Element 3: PEC *Did Not Know* the Money
                          Delivered Was the Proceeds of Unlawful
                          Activity ............................................................... 6

                    (iv)  Element 4: PEC Believed it Was Accepting
                          Payment Owed for Merchandise Delivered ........... 7

               2.   The Affidavit Does Not Provide Evidence That PEC
               Failed to File a Required Report of Currency Transaction ......... 7

               3.   Structuring Financial Transactions to Evade Reporting
               Requirements ................................................................................. 8

    B.   The Evidence Supporting the Probable Cause Finding Was Stale ......... 9

    C.   The Search Warrant Was Overbroad in Authorizing the Seizure
         of Too Much Evidence ............................................................................ 11

         1.   The Warrant Lacked Particularity ............................................... 11

               a.    The scope of the warrant was overbroad ........................... 11

              b.    The seizure and search of digital devices went far
                  beyond the scope of probable cause ................................... 15

                    (i)    There was no probable cause to search the
                          digital devices ..................................................... 15

                    (ii)   The warrant failed to account for the unique

nature of computers and cell phones......................17

(iii)   Defendants do not know whether the search protocols in Attachment B were followed............18

D.   The Good Faith Exception Cannot Apply .............................18

E.   The Fruits of the Unlawful Search Must Be Suppressed....................19

IV.   CONCLUSION ............................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Application For A Search Warrant To Seize & Search Elec. Devices From Edward Cunnius*,
  770 F. Supp. 2d 1138 (W.D. Wash. 2011) ........................................................ 17

*Center Art Galleries-Hawaii, Inc. v. United States*,
  875 F.2d 747 (9th Cir. 1989) ............................................................................. 14

*Durham v. United States*,
  403 F.2d 190 (9th Cir. 1968) ............................................................................... 9

*In re Grand Jury Subpoenas Dated Dec. 10, 1987*,
  856-57 (9th Cir. 1991) ....................................................................................... 11

*In re Grand Jury Subpoenas Dated Dec. 10, 1987*,
  926 F.2d 847 (9th Cir. 1991) ............................................................................. 11

*Riley v. California*,
  134 S. Ct. 2473 (2014) ....................................................................................... 17

*United States v. Clark*,
  31 F.3d 831 (9th Cir. 1994) ............................................................................... 11

*United States v. Comprehensive Drug Testing, Inc.*,
  621 F.3d 1162 (9th Cir. 2010) ........................................................................... 18

*United States v. Dozier*,
  844 F.2d 701 (9th Cir. 1988) ............................................................................. 10

*United States v. Gann*,
  732 F.2d 714 (9th Cir. 1984) ............................................................................. 10

*United States v. Grant*,
  682 F.3d 827 (9th Cir. 2012) ............................................................................... 9

*United States v. Kow*,
  58 F.3d 423 (9th Cir. 1995) ......................................................................... 13, 14

*United States v. Lacy*,
  119 F.3d 742 (9th Cir. 1997) ............................................................................. 10

*United States v. Leon*,
    468 U.S. 897 (1984) .................................................................. 18, 19

*United States v. MacPherson*,
    424 F.3d 183 (2d Cir. 2005) ................................................................ 8

*United States v. Mayer*,
    560 F.3d 948 (9th Cir. 2009) ............................................................... 3

*United States v. McClendon*,
    713 F.3d 1211 (9th Cir. 2013) ........................................................... 19

*United States v. Offices Known as 50 State Distrib. Co.*,
    708 F.2d 1371 (9th Cir. 1983) ........................................................... 14

*United States v. Pang*,
    362 F.3d 1187 (9th Cir. 2004) ............................................................. 8

*United States v. Scholl*,
    166 F.3d 964 (9th Cir. 1999) ............................................................... 8

*United States v. Spilotro*,
    800 F.2d 959 (9th Cir. 1986) ............................................................. 14

*United States v. Underwood*,
    725 F.3d 1076 (9th Cir. 2013) ........................................................ 3, 19

*United States v. Vigeant*,
    176 F.3d 565 (1st Cir. 1999) ............................................................... 7

*United States v. Weber*,
    923 F.2d 1338 (9th Cir. 1990) ........................................................... 11

*United States v. Wilkes*,
    662 F.3d 524 (9th Cir. 2011) ............................................................... 4

*United States v. Zimmerman*,
    277 F.3d 426 (3d Cir. 2002) ............................................................... 9

*VonderAhe v. Howland*,
    508 F.2d 364 (9th Cir. 1974) ............................................................. 13

*Yslava v. Hughes Aircraft Co.*,
    1998 WL 35298580 (D. Ariz. June 29, 1998) ..................................... 6

**Statutes**

18 U.S.C. § 371.............................................................................................2

18 U.S.C. § 1956................................................................................passim

31 U.S.C. § 5324.......................................................................2, 7,8

31 U.S.C. §§ 5331................................................................................2

MOTION TO SUPPRESS EVIDENCE DUE TO LACK OF PROBABLE CAUSE AND OVERBREADTH

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

Numerous constitutional deficiencies plague the search warrant for Pacific Eurotex Corp. ("PEC") in this case.  As detailed in the concurrently filed motion for a *Franks* hearing, agents obtained the warrant through material omissions and false statements.  And as detailed in the motion to suppress evidence seized from Neman Real Estate Investments, LLC ("NRE"), agents knowingly exceeded the scope of the warrant, which only authorized the search of the business location of PEC.  But, as the instant motion describes, even if the agents had not exceeded the scope of the warrant and had not obtained the warrant through material omissions and false statements, the warrant itself relied upon stale evidence, did not establish probable cause as to the specified offenses, and authorized far too broad a sweep of items to be seized.  As a result, the Court should suppress all of the evidence obtained during the search and any evidence derived therefrom.

### II.

### FACTUAL BACKGROUND

On September 5, 2014, Department of Homeland Security Special Agent Michael Browning submitted an affidavit in support of a request for a search warrant.  (*See* Pacific Eurotex Warrant, attachments, and supporting affidavit).[1]

---

[1]   The defense is informed that the search warrants in this case remain under seal. Accordingly, the Pacific Eurotex search warrant, together with the supporting affidavit, is being lodged under seal concurrently with the filing of the defendants' various motions to suppress evidence seized during the execution of the search warrants.  (*See* Dkt. Nos. 95 & 96).  Also being lodged are two related search warrants.  The lodged search warrants are referenced as follows: 1) Pacific Eurotex Search Warrant; 2) Wilshire Residence Search Warrant; and 3) Elm Drive Search Warrant.  All references to the "Browning Affidavit" or "Browning Aff" in this Motion refer to the affidavit in support of the Pacific Eurotex Search Warrant, unless otherwise specifically noted.

1

1  The affidavit requested permission to search "the business location of Pacific

2  Eurotex, Corp." and was based on the premise that there was probable cause to

3  believe that PEC (but not any individual) was violating 18 U.S.C. § 1956(h) (money

4  laundering conspiracy); 31 U.S.C. §§ 5331 and 5324(b) (failing to file reports of

5  currency transactions over $10,000 in a nonfinancial trade or business); 31 U.S.C.

6  §§ 5324(a) (structuring cash deposits to evade reporting requirements); and 18

7  U.S.C. § 371 (conspiracy to structure financial transactions to evade reporting

8  requirements).

9       The facts set forth in the supporting affidavit are discussed in detail below,

10  but can be broadly outlined as follows: 1) a confidential informant ("CI") employed

11  by the Government told agents that he obtained cash from drug dealers and

12  delivered it to certain businesses in the Los Angeles Fashion District as payment

13  from Mexican customers of those Fashion District businesses for goods shipped to

14  Mexico by those businesses; 2) the CI took direction regarding collection and

15  distribution of the cash from "peso brokers" in Mexico or Mexican customers of the

16  LA Fashion District businesses; 3) on four occasions during the summer of 2013,

17  the CI told agents that he had been directed to deliver cash payments to PEC, and

18  those payments were delivered by an undercover agent on the CI's behalf; 4) PEC

19  did not file the necessary reporting forms (IRS Form 8300) when it received these

20  cash payments, each of which was over $10,000, despite the fact that agents had

21  previously visited the business and spoken to two individuals there regarding the

22  reporting requirement; 5) the money paid to PEC by the undercover was

23  subsequently deposited into a bank account not associated with PEC in what the

24  affiant alleged were "structured" deposits intended to avoid certain reporting

25  requirements triggered by bank transactions in excess of $10,000; 6) on other

26  occasions up to 2012, PEC made certain deposits into its own accounts which were

27  in excess of $10,000 and which the affiant termed "bulk cash" deposits.  (Browning

28  Aff. ¶ 11-31).

1       The warrant was authorized by Magistrate Judge Walsh and was executed on

2  September 10, 2014.  However, as discussed below, the showing of probable cause

3  was deficient as to each of the listed violations, the evidence in support of the

4  warrant was stale, and the categories of items which agents sought authorization to

5  seize were so broad so as to turn the warrant into a general warrant authorizing the

6  seizure of every single business record on the premises.

7                                  **III.**

8                                **ARGUMENT**

9  **A.    The Search Warrant Affidavit Did Not Present Sufficient Evidence To**

10         **Support a Finding of Probable Cause**

11       To be valid, a search warrant must be supported by an affidavit establishing

12  probable cause.  *United States v. Mayer*, 560 F.3d 948, 958 (9th Cir. 2009).  The

13  affidavit must set forth circumstances to support a finding by the issuing judge that

14  "there is a fair probability that contraband or evidence of a crime will be found in a

15  particular place."  *United States v. Underwood*, 725 F.3d 1076, 1084 (9th Cir. 2013)

16  (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).  It is obviously a prerequisite

17  that, as part of that showing, the affidavit must establish that a crime has been

18  committed.

19       If a warrant lacks probable cause, evidence obtained during its execution

20  should generally be suppressed under the exclusionary rule.  *Underwood*, 725 F.3d

21  at 1081 (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961) and *Weeks v. United States*,

22  232 U.S. 383, 393 (1914)).

23        **1.    The Affidavit Does Not Provide Evidence That PEC Engaged in**

24           **Money Laundering**

25             **a.    *Elements of Money Laundering Conspiracy***

26       SA Browning's affidavit did not specify which of the specific money

27  laundering prohibitions PEC was suspected of violating.  However, the indictment

28  eventually charged PEC and others with a conspiracy to violate 18 U.S.C. §

3

1956(a)(1)(B)(ii).  (*See* Indictment, Count 1).  To convict a person for money laundering under 18 U.S.C. § 1956(a)(1)(B)(ii), the government must prove that (1) the defendant conducted or attempted to conduct a financial transaction; (2) the property involved in the transaction represented proceeds of specified unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity; and (4) the defendant knew that the transaction was designed in whole or in part to avoid a transaction reporting requirement under State or Federal law.  18 U.S.C. § 1956(a)(1)(B)(ii); *see also United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011) (listing elements for 18 U.S.C. § 1956(a)(1)(B)(i)).

Stripped of its conclusory statements and background information regarding purported black market peso exchanges, SA Browning's affidavit offered no facts to show probable cause that PEC was engaged in a money laundering conspiracy. While PEC allegedly conducted certain financial transactions, there is no evidence that the property involved in the transactions represented proceeds of specified unlawful activity (Element 2), that PEC knew that the property constituted proceeds from unlawful activity (Element 3), or that PEC knew that the transaction was designed in whole or in part to avoid a transaction reporting requirement (Element 4).  There was thus no basis to believe that the crime of money laundering had occurred, at least as to PEC or its agents.

### (i)     Element 1: PEC Engaged in Four Financial Transactions

Assuming the truth of the allegations in the affidavit, on four occasions – May 30, June 7, August 1, and August 9, 2013 – an undercover agent delivered money to PEC which was represented to be payment on behalf of two real PEC customers who owed money for real merchandise they purchased from PEC.  (Browning Aff. ¶ 19).  PEC accepted payment of money it was owed.  (*Id*.).  Thus, PEC did arguably engage in certain financial transactions.

4

(ii)     **Element 2: The Money Involved in the Transactions
*Did Not* Represent Proceeds of Specified Unlawful
Activity**

However, other than SA Browning's conclusory statement that the
undercover agent "picked up narcotics proceeds from the CI" and delivered some
portion of those proceeds to PEC, there is no evidence that the money delivered to
PEC on the four occasions was proceeds of specified unlawful activity, i.e., drug
trafficking.[2]

Taking the CI at his word, SA Browning sets forth five instances when the CI
received deliveries of narcotics proceeds.  (Browning Aff. ¶ 16).  Of those, two
occurred *after* the deliveries of cash by the undercover agent to PEC.  (Browning
Aff. ¶ 16(b) and (c)) (documenting cash deliveries to the CI on September 12, 2013,
and February 28, 2014).  They are thus not relevant to PEC.

But even the deliveries that occurred prior to and in between the deliveries to
PEC are not tied to the undercover deliveries of money to PEC.  There is no
indication by the CI that the collections of cash described in paragraph 16 of SA
Browning's affidavit were related to PEC or intended to be used as payment to PEC.
Nor is there any indication anywhere in the affidavit that the cash noted in paragraph
16 was in fact delivered to PEC.  Nor does the affidavit even state that the CI *told*
agents that the money the CI gave to the undercover agent was narcotics proceeds.[3]

---

[2]   Specified unlawful activity is defined at 18 U.S.C. § 1956(c)(7).  Drug
trafficking is a specified unlawful activity.  *Id.*  It is the only "specified unlawful
activity" which is discussed in SA Browning's affidavit.

[3]   All of this is in addition to the material facts that were omitted by SA Browning
which further undermine the proposition that the money delivered to PEC was
proceeds of drug trafficking.  Those omissions are detailed in a concurrently filed
motion to suppress and request for a *Franks* hearing.  But for purposes of the instant
motion, the defense will accept as true the allegations in the affidavit.  By doing so,
the defense does not concede that the allegations in the affidavit are true, or that the

Instead, SA Browning assumes without support that any money the CI gave to the undercover agent must be narcotics proceeds.  But he does not tie the assertion to facts so as to show that the money delivered to PEC was in fact the proceeds of "specified unlawful activity."

Thus Element 2 is missing from the affidavit.

### (iii)   Element 3: PEC *Did Not Know* the Money Delivered Was the Proceeds of Unlawful Activity

There is no indication anywhere in the affidavit that PEC – or any PEC employees – knew that the money delivered by the undercover agent was the proceeds of unlawful activity.  At most, Hersel Neman and Alma Villalobos were given a general warning in a form that they may or may not have read that "drug dealers and smugglers often use large cash payments to 'launder' money."  (Browning Aff. ¶ 17).  Such a general warning is not enough to create liability in tort, let alone in criminal law.  *See, e.g.  Yslava v. Hughes Aircraft Co.*, 1998 WL 35298580, at *16 (D. Ariz. June 29, 1998) ("While general warnings may have provided Defendant with the mere knowledge and appreciation of a risk, specific warnings are necessary to provide Defendant with substantial certainty. The defendant who acts in the belief or consciousness that the act is causing an appreciable risk of harm to another may be negligent, and if the risk of harm is great the conduct may be characterized as reckless or wanton, but it is not an intentional wrong.") (internal citation and quotation marks omitted).

There were no specific warnings or information given to PEC or its employees about the money delivered by the undercover agent.  No one told any PEC employee, or insinuated in any way, that the money delivered was proceeds of a crime.  There is no indication that PEC or its employees knew that the money was in fact proceeds of a crime (if in fact it was).  To the contrary, the only statements

_____

affidavit did not include material omissions.

6

MOTION TO SUPPRESS EVIDENCE DUE TO LACK OF PROBABLE CAUSE AND OVERBREADTH

attributed to the undercover agent were that she was delivering the money on behalf of "Abraham Dichy" and "Mayer,"[4] who were actual PEC customers.  (Browning Aff. at ¶¶ 19a-d).  Accordingly, PEC believed that it was accepting payment for merchandise it had sold and shipped to legitimate customers.  Even assuming the method of payment was unusual (which is not a fair assumption for garment district businesses), that is not sufficient to show PEC knew the money was from criminal activity.  Nor is the failure to file an IRS Form 8300 evidence of such knowledge, as any such failure reveals nothing about the actors' knowledge regarding the source of the funds.  Similarly, the alleged failure to give a receipt is not evidence regarding the source of the funds.

Thus Element 3 is missing from the affidavit.

### (iv)   Element 4: PEC Believed it Was Accepting Payment Owed for Merchandise Delivered

SA Browning never states in his affidavit what reporting requirement PEC purportedly knew the transaction was designed to avoid, as required by the money laundering statute.  Instead, SA Browning states that the undercover told PEC that the money being delivered was on behalf of certain customers.  (Browning Aff. ¶ 19).  Thus PEC believed the transaction was a legitimate payment for goods delivered.  Accordingly Element 4 is missing from the affidavit.

For all of these reasons, the evidence seized during the execution of the search warrant must be suppressed.  *United States v. Vigeant*, 176 F.3d 565, 570 (1st Cir. 1999) (suppressing evidence where there was no probable cause to believe the defendant had committed money laundering).

### 2.   The Affidavit Does Not Provide Evidence That PEC Failed to File a Required Report of Currency Transaction

To convict a person for a reporting violation under 31 U.S.C. § 5324(b)(1),

---

[4]   Also referred to in the affidavit as "Major" and "Mayer Amber."

1  the government must prove that the person "cause[d] or attempt[ed] to cause a
2  nonfinancial trade or business to fail to file a report required under section 5331 or
3  any regulation prescribed under such section" "for the purpose of evading the report
4  requirements of section 5331 or any regulation prescribed under such section."  31
5  U.S.C. § 5324.  Obviously, if the defendant acted to evade a reporting requirement,
6  he or she would have to know about the requirement.  Indeed, to convict a defendant
7  under this statute, the government must prove that a defendant knew of the
8  requirement he allegedly failed to satisfy.  *See United States v. Scholl*, 166 F.3d 964,
9  979 (9th Cir. 1999).

10      There was no evidence in the affidavit to suggest that the defendants knew
11  they were supposed to file a report of a currency transaction on behalf of PEC.
12  Rather, the evidence demonstrated that Hersel Neman believed *the customer* was the
13  party required to fill out the report.  (Browning Aff. ¶ 18).  The agents on the scene
14  when Mr. Neman verbalized this belief Alma Villalobos did nothing to correct this
15  misimpression.  Thus there cannot be a willful violation by PEC or anyone else, as
16  required by the statute.  Accordingly, there was insufficient evidence to believe that
17  a violation of 31 U.S.C. § 5324(b)(1) had occurred, or that evidence of such
18  violation would be found at PEC.

19      **3.    Structuring Financial Transactions to Evade Reporting**
20            **Requirements**

21      To convict a person for structuring in violation of 31 U.S.C. § 5324(a), the
22  government must prove: "1) the defendant [] engaged in acts of structuring; (2) he
23  [did] so with knowledge that the financial institutions involved were legally
24  obligated to report currency transactions in excess of $10,000; and (3) he [] acted
25  with the intent to evade this reporting requirement."  *United States v. MacPherson*,
26  424 F.3d 183, 189 (2d Cir. 2005); *see also United States v. Pang*, 362 F.3d 1187
27  (9th Cir. 2004).

28      There was no basis to believe that evidence of structuring would be found at

PEC.  Other than a conclusory statement that "money from the cash deliveries made to Pacific Eurotex by the UCA" were "at least partially structured" into Mojgan Neman's personal Wells Fargo Checking Account (Browning Aff. ¶ 24), there is no evidence that the money at issue in the allegedly structured deposits was connected in any way to PEC.  SA Browning did not explain what evidence there was on which to base this assertion, and indeed, as described in Defendants' concurrently-filed *Franks* motion, SA Browning failed to inform Magistrate Judge Walsh that the cash delivered to PEC by the UCA was not marked or traceable in any way.  Nor was the relevant account held in the name of PEC or controlled by PEC. Accordingly, there was no cause to believe that PEC was involved in structuring financial transactions.  None of the relevant elements were met given that there was no indication that the business or its agents were involved in the alleged crime. Thus, there was no basis to search PEC for evidence related to this purported offense.

**B.     The Evidence Supporting the Probable Cause Finding Was Stale**

Even if these evidentiary problems did not exist, the evidence related to all of the specified offenses could not have supported a finding of probable cause because it was stale given the passage of time between the facts reported in the affidavit and the issuance of the search warrant.

An affidavit must be based on facts "'so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" *Durham v. United States*, 403 F.2d 190, 193 (9th Cir. 1968) (*quoting Sgro v. United States*, 287 U.S. 206, 210 (1932) and finding evidence from four months prior to search warrant application to be stale); *see also United States v. Grant*, 682 F.3d 827, 835 (9th Cir. 2012) (finding no evidence of a continuing pattern or other good reason to support an inference that evidence of a crime would remain in a location from early June until the end of August); *United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002) (finding evidence in affidavit that defendant had accessed adult

1    pornography six and ten months earlier to be stale).

2         While it is true "[t]he mere lapse of substantial amounts of time is not

3    controlling in a question of staleness" (*United States v. Dozier*, 844 F.2d 701, 707

4    (9th Cir. 1988)), in order to avoid a finding of staleness, the affidavit must set forth

5    evidence to support a "sufficient basis to believe, based on a continuing pattern or

6    other good reasons, that the items to be seized are still on the premises" (*United

7    States v. Gann*, 732 F.2d 714, 722 (9th Cir. 1984)).  *United States v. Lacy*, 119 F.3d

8    742, 745-46 (9th Cir. 1997).

9         Here there was no such basis.  The warrant was submitted on September 5,

10   2014.  But the last known delivery of cash to PEC occurred in August 2013.

11   (Browning Aff. ¶ 19).  Thus, the last transaction that implicates either the money

12   laundering statute or the financial reporting statute regarding the IRS Form 8300

13   occurred *13 months before the affidavit was written*.  There is no information in the

14   affidavit to suggest that such payments were a regular occurrence or, more

15   importantly, were ongoing.  Nor is there any evidence in the affidavit that PEC

16   continued to accept cash payments in excess of $10,000 from anyone – Mexican

17   customers or otherwise – after August 2013.  Even the last of the "bulk cash"

18   deposits referenced in the affidavit occurred in June 2012.  (Browning Aff. ¶ 28).

19        There was likewise no evidence that the allegedly structured bank

20   transactions were continuing.  The most recent of the allegedly structured

21   transactions occurred in February 2014, *seven months* before the affidavit was

22   written.  SA Browning presumably could have obtained the records from the

23   intervening seven months to confirm whether the transactions were continuing but

24   he failed to do so.

25         The affidavit thus contains no information to suggest a continuing pattern of

26   activity or that the items to be seized would still be on the premises.  The agent's

27   general statement that he believed that the information might still be on the premises

28   (Browning Aff. ¶ 34) is plainly insufficient to establish probable cause at the time

1    the warrant was issued.  There must be evidence based in fact, not mere supposition

2    by the agent who has not basis for knowledge.  Accordingly, because the affidavit

3    fails to establish any basis to believe that the items to be seized were still on the

4    premises, any evidence seized pursuant to the warrant should be suppressed.

5    **C.**     **The Search Warrant Was Overbroad in Authorizing the Seizure of Too**

6        **Much Evidence**

7       To satisfy the Fourth Amendment, a search must be limited in scope both as

8    to particularity and breadth.  "Particularity is the requirement that the warrant must

9    clearly state what is sought," *In re Grand Jury Subpoenas Dated Dec. 10, 1987*,

10   856-57 (9th Cir. 1991) (citation omitted), in order to "provide meaningful guidance

11   to the officer charged with its execution."  *United States v. Clark*, 31 F.3d 831, 836

12   (9th Cir. 1994).  Breadth "deals with the requirement that the scope of the warrant

13   be limited by the probable cause on which the warrant is based."  *Id.* (citation

14   omitted)  In other words, "probable cause must exist to seize all the items of a

15   particular type described in the warrant*." In re Grand Jury Subpoenas Dated Dec.*

16   *10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991) (citation and internal quotation marks

17   omitted).

18      **1.**     **The Warrant Lacked Particularity**

19         **a.**     **The scope of the warrant was overbroad**

20       The scope of the warrant "must be no broader than the probable cause on

21   which it is based."  *United States v. Weber*, 923 F.2d 1338, 1342 (9th Cir. 1990)

22   (citing *VonderAhe v. Howland,* 508 F.2d 364 (9th Cir. 1974)).  The scope of the

23   warrant here was patently overbroad.

24       Assuming the supporting affidavit here established probable cause to believe

25   that more than one year prior to the application for the warrant, there had been four

26   cash payments for goods that the Government contends represents money

27   laundering, along with the subsequent failure to file reports of cash transactions

28   exceeding $10,000 and, possibly, the "structuring" of those transactions, the

warrant's scope should have been limited accordingly.  Instead, "Attachment B" to the warrant lists a number of sweeping categories of materials to seize at PEC. These broad categories do not correspond to the activity alleged in the warrant and, indeed, appear to give the agents carte blanche to seize any and all business records of this company.  (Pacific Eurotex Warrant, Attachment B, i-v) ("Attachment B"). For example, the warrant directed the seizure of, *inter alia*:

> d. Records and receipts of payments, cash receipt journals, cash disbursement journals, sales journals, petty cash ledgers, and accounts receivable ledgers;

> h. Documents relating to the sale and exportation of merchandise during the time period between January 1, 2012 and the present;

> i. Customer files for foreign-based customers or customers receiving exported merchandise, and customers making cash payments, including records of such cash payments, customer ledgers, correspondence, notes concerning customers, and communications such as emails or faxes denoting denominations and amounts of U.S. currency that were deposited or credited to customer accounts;

> j. Records of foreign and domestic accounts and transactions at financial institutions including account statements, transaction confirmations, and cashier's checks; and financial records and/or notes showing payment, receipt, concealment, transfer, or movement of cash or monetary instruments.

> o. Documents reflecting the acquisition, disposition, transfer, gift, or sale of any assets, such as real property, vehicles, collectibles, jewelry, furniture, or any other personal property, including purchase agreements, contracts, correspondence appraisals, receipts, invoices, deeds, deeds of trust, title records, loan records, or other documentation of ownership.

1    (Attachment B, i-iii).

2         These materials are not tethered to the probable cause arguably demonstrated

3    in the affidavit.  Where probable cause exists for some business records, this does

4    not support the seizure of all others.  *See VonderAhe*, 508 F.2d at 370 (finding

5    warrant overbroad where it failed to limit the items seized in dentist's office and

6    home to those incriminating items the agents knew or had probable cause to believe

7    existed therein).  In *United States v. Kow*, 58 F.3d 423 (9th Cir. 1995), the business-

8    owner defendants were charged with tax evasion and fraud.  While the affidavit

9    established probable cause to believe defendants had engaged in fraud and tax

10   evasion, the warrant's scope did not align with that probable cause.  Instead, by

11   listing various categories of business documents, it sought "the seizure of virtually

12   every document and computer file."  *Kow*, 58 F.3d at 427-428.  Because the

13   probable cause in the warrant did not support such seizures, and there was no other

14   meaningful limitation, the court rejected the warrant as both unparticular and

15   overbroad.  *Id.*

16        Similarly here, Attachment B amounted to the seizure of virtually every

17   business record at PEC.  As the affidavit noted, PEC is a textile import and export

18   business.  (Browning Aff., p. 5).  Therefore, to seize "Documents relating to the sale

19   and exportation of merchandise" could conceivably cover every document on the

20   premises.  (Browning Aff., ii).  Any document it would not cover would surely be

21   captured by the other expansive categories.  For example, item "i" authorizes the

22   seizure of customer files "for all foreign-based customers or customers receiving

23   exported merchandise, and customers making cash payments" and records of those

24   transactions.  Meanwhile, item "j" demands the seizure of all records of "foreign

25   and domestic accounts and transactions at financial institutions." (Attachment B., ii).

26   Combined, these categories implicate most, if not all, of the documents pertaining to

27   PEC's business operations.

28        The Government had the ability to limit the scope of the warrant to avoid a

1  wholesale seizure of PEC's business records.  *See, e.g.*, *Center Art Galleries-*

2  *Hawaii, Inc. v. United States*, 875 F.2d 747 (9th Cir. 1989) (invalidating warrant

3  permitting an expansive seizure of "documents, books, ledgers, records and

4  objects," that should have been limited to evidence regarding sale of specific

5  counterfeit artwork.); *see also United States v. Spilotro*, 800 F.2d 959, 966 (9th Cir.

6  1986) (rejecting warrant as overbroad where it provided only general categories of

7  evidence to seize from jewelry store and although "[t]he Government did not know

8  exactly what it needed in the case at bar," the descriptions in the warrant still "might

9  have been significantly narrowed.")  Instead of limiting the search to the two-month

10  period in which the alleged criminal activity occurred, the Government instead

11  sought the seizure of material over two years.  More egregiously, accepting the

12  affiant's own theory that the money laundering and "structured" deposits derived

13  from cash deliveries made on behalf of Mexican customers, the affiant still failed to

14  meaningfully limit the scope of the search warrant to material related only to those

15  customers or indeed to all Mexican customers.

16      Without these limitations, the devouring scope of the warrant here was valid

17  only if PEC is "merely a scheme to defraud or … all of [its] records are likely to

18  evidence criminal activity."  *Kow*, 58 F.3d at 427 (finding warrant overbroad where

19  it authorized "the seizure of virtually every business record" in the defendant's

20  office even though the material in the office related to a narrow set of crimes)

21  (citation omitted).  In *Center Art Galleries-Hawaii, Inc*., the government could not

22  avail itself of this exception where only 20 percent of the gallery's business was

23  related to potential fraud.  *Center Art Galleries-Hawaii, Inc.*, 875 F.2d at 751.

24      The affidavit here did not, nor could it have averred that PEC was so

25  "permeated with fraud" that it was impossible "to segregate those business records

26  that would be evidence of fraud from those that would not."  *United States v. Offices*

27  *Known as 50 State Distrib. Co.,* 708 F.2d 1371, 1374 (9th Cir. 1983).  As noted

28  above, the probable cause in the affidavit here was linked, at most, to four cash

1  payments and a series of deposits and the failure to file forms between May and

2  August 2013.   In light of PEC's size, number of customers, and volume of sales,

3  this falls significantly short of illustrating an operation "permeated with fraud."

4  Also, those discrete series of transactions and deposits could have been easily

5  segregated from the other material by simply limiting the search warrant to evidence

6  of those particular deposits.

7        Though the items contained in Attachment B appear to have limited the scope

8  of the search, they actually expanded it far beyond the contours of probable cause

9  purportedly established in the affidavit.  As a result, the search transformed into the

10 kind of "wide-ranging exploratory searches the Framers intended to prohibit."

11 *Garrison*, 480 U.S. at 84.

12       **b.     The seizure and search of digital devices went far beyond the**

13              **scope of probable cause**

14       The affidavit commanded the seizure of virtually every tangible business

15 record at PEC.  Yet, it did not stop there.  The last category of items on Attachment

16 B demanded agents to seize "any digital device," including desktop computers,

17 laptops, central processing units, smart phones and a legion of other sensitive data

18 such as passwords and email.  (Attachment B, iii-v; *see also* Browning Aff. ¶40).

19 This boundless license exceeded any probable cause established in the affidavit.

20       **(i)     There was no probable cause to search the digital**

21              **devices**

22       While the affidavit here purports to limit itself only to digital devices

23 containing evidence "falling within the scope of the foregoing categories of items to

24 be seized," this is a superficial constraint.  To the extent those devices could capture

25 the same material listed in the prior categories, they reach beyond the scope of

26 probable cause for the same reason described above: the sprawling categories listed

27 in Attachment B authorize the seizure of practically every document at PEC.

28       Also, the portion of Attachment B pertaining to digital devices asked for

much more.  Similar to how Attachment B sought virtually every tangible document at PEC, it also sought almost every piece of data a digital device could contain.  For example, it authorized the search and seizure of, among others:

> i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, email contacts, chat and instant messaging logs, photographs, and correspondence;
>
> ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software";
>
> iii. evidence of attachment of other devices;
>
> v. evidence of the times the device was used;
>
> vi. passwords, encryption keys, and other access devices that may be necessary to access the device;
>
> viii. records of or information about Internet Protocol addresses used by the device
>
> ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, 'bookmarked' or 'favorite' web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.;

(Attahment B, iii-iv.)

The affidavit offers no reason why it should be entitled to such material.  At most, it extends only the conclusory allegations that "businesses involved in international commerce, utilize computers to complete daily tasks" and that

MOTION TO SUPPRESS EVIDENCE DUE TO LACK OF PROBABLE CAUSE AND OVERBREADTH

1  businesses involved in the "black market peso exchange" may retain communication

2  regarding such in "digital form." (Browning Aff. ¶¶ 32-33.)  For the reasons

3  described above and in concurrently filed motions to suppress on other grounds, the

4  affidavit utterly failed to establish probable cause to find evidence of such crimes.

5  Moreover, these bare conclusions do not justify perusing every conceivable digital

6  device for sensitive material like passwords or internet browser history.

7                    (ii)      **The warrant failed to account for the unique nature of**

8                              **computers and cell phones**

9          Simply put, the search of a digital device is not like the search of a home or

10  office.  "These digital devices are not just repositories of data, but access points, or

11  portals, to other digital devices and data, typically obtained through the internet or

12  stored on a network."  *In re U.S.'s Application For A Search Warrant To Seize &*

13  *Search Elec. Devices From Edward Cunnius*, 770 F. Supp. 2d 1138, 1145 (W.D.

14  Wash. 2011).

15          Here, the warrant authorized the government to seize every thinkable digital

16  device, and virtually every form of information contained therein.  It further sought

17  "passwords" and "evidence of attachment of other devices," which would then

18  create access to further voluminous sources of sensitive material.

19          Particularly disturbing is how the warrant authorized the confiscation and

20  search of cell phones.  (Attachment B, v).  It is accepted that the search of a cell

21  phone, like the search of a computer, is unlike other searches.  "A phone not only

22  contains in digital form many sensitive records previously found in the home; it also

23  contains a broad array of private information never found in a home in any form—

24  unless the phone is." *Riley v. California*, 134 S. Ct. 2473, 2491 (2014) (finding that

25  searches of cell phones incident to an arrest violate the Fourth Amendment).

26          For one, cell phones carry a stunning volume of information.  As the Supreme

27  Court noted, "it is no exaggeration to say that many of the more than 90% of

28  American adults who own a cell phone keep on their person a digital record of

3129855.4

17

MOTION TO SUPPRESS EVIDENCE DUE TO LACK OF PROBABLE CAUSE AND OVERBREADTH

nearly every aspect of their lives—from the mundane to the intimate." *Id.* (citing *Ontario v. Quon,* 560 U.S. 746, 760 (2010)).  Also unique is the quality of the information they contain.  A sketch of a person's entire life can be lifted from the internet search and browsing histories, GPS monitoring, and the endless variety of mobile application software (i.e., "apps") that can be installed on a phone.  *Id.*  In fact, "[t]he average smart phone user has installed 33 apps, which together can form a revealing montage of the user's life."  *Id.* (citation omitted).

**(iii)**   **Defendants do not know whether the search protocols in Attachment B were followed**

Defendants have requested Government notes and records concerning the search protocols employed for the computers, cell phones and other electronic devices seized pursuant to the overbroad warrant.  Because that information has not yet been produced, Defendants cannot yet determine whether the Government followed proper protocols.  See, e.g., *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162 (9th Cir. 2010).  Accordingly, Defendants reserve the right to seek suppression of evidence on these additional grounds once the Government provides this information.

**D.**   **The Good Faith Exception Cannot Apply**

SA Browning or his team could not have reasonably relied on the affidavit under these circumstances.  The affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *United States v. Leon*, 468 U.S. 897, 923 (1984).  Any agent reading the affidavit would have realized this.  Anyone reading the affidavit would inevitably conclude that there is no "reasonable nexus between the activities supporting probable cause and the location[] to be searched."  *Ocampo*, 937 F.2d at 490.  Thus the "good faith exception" cannot apply.

Further, the *Leon* good faith exception does not apply where "a warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the

**18**

things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923 (citation omitted).  Here, the warrant authorized the search of every single record present at PEC.  In such a situation, the Court "need not inquire further and can conclude that the good faith exception to the exclusionary rule does not apply."  *United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013) (citation and internal quotation marks omitted).

**E.      The Fruits of the Unlawful Search Must Be Suppressed**

Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered "fruit of the poisonous tree" and is inadmissible under the exclusionary rule. *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) (citing *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963)).

**IV.**

**CONCLUSION**

For the foregoing reasons, Pacific Eurotex Corp. and Morad Neman respectfully request that this Court suppress the following evidence:

a.      Everything seized from Pacific Eurotex and Neman Real Estate

b.      All fruits of the unlawful search

MOTION TO SUPPRESS EVIDENCE DUE TO LACK OF PROBABLE CAUSE AND OVERBREADTH

1  DATED:  December 4, 2014

Terry W. Bird
2
Mitchell A. Kamin
Ariel A. Neuman
3
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.
4

5

6
By:  _____/s/_____
7
Terry W. Bird
8  Mitchell A. Kamin
Ariel A. Neuman
9  Attorneys for Defendants Pacific Eurotex
Corp. and Morad Neman
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28